Marshall, C. J.
This cause originated in the superior court of Cincinnati, in which it was sought to enjoin the transfer of funds from the waterworks department of the city of Cincinnati to the general fund of the city, and to enjoin the alleged misapplication of the surplus funds derived from operation of the waterworks toward the payment of fixed charges and current expenses of the city. The petition was filed by a taxpayer after the city solicitor had been requested and refused to do so, and the petition alleges that on or about December 13,1921, the council of the city of Cincinnati passed an ordinance authorizing the director of public service to assess and collect water rents of such amount and in such manner as he deems most equitable upon all tenements and premises supplied with water in the city of Cincinnati, and further providing that all monies in excess of the amount required to meet the cost and expenses of operation of the waterworks and to meet the interest and sinking fund charges on all outstanding bonds, loans, or other indebtedness, caused by the construction of the waterworks, and known as waterworks bonds or *147 obligations,' shall be deemed a surplus and shall be used for general municipal purposes, and further authorizing .the director of public service to draw a voucher for such surplus to the city treasurer to be placed to the credit of the general fund of the city and to be used and applied toward the payment of “fixed charges and current expenses” as set forth in the semiannual appropriation ordinances of the city. The entire text of the ordinance is attached to the petition as an exhibit and made a part thereof.
The petition further alleges that the city has outstanding indebtedness due to waterworks construction amounting to approximately $15,000,000, and that there is now in the sinking fund approximately $4,000,000, leaving outstanding a net waterworks indebtedness of approximately $11,000,000. It is the theory of the petition that any surplus fund arising from the assessment and collection of water rents, and remaining after the payment of cost and expenses of operation of the plant, can only be applied to the payment of repairs, enlargement or extension of the works, or for the building of reservoirs, or for the payment of interest upon bonds issued for their construction, or for the creation of a sinking fund to liquidate the debt; and for no other purposes whatsoever.
• A demurrer was filed to the petition in the superior court, which demurrer was overruled, and, the defendants not desiring to further plead, judgment was entered granting a perpetual injunction. The cause was thereupon appealed to the court of appeals in which the same procedure was followed and the same judgment entered. Error has been *148 prosecuted to this court to reverse the judgment of the court of appeals.
The full text of the ordinance is as follows:
“See. 110-1. The Director of Public Service may assess and collect from time to time a water rent of such amount and in such manner as he deems most equitable upon all tenements and premises supplied with water. When more than one tenant or water taker is supplied with one hydrant or off the same pipe, and when the assessments thereof are not paid when due, the Director of Public Service shall look directly to the owner of the property for so much of the water rent thereof as remains unpaid, which shall be collected in the same manner as other city taxes.
‘ ‘ See. 110-2. The Director of Public Service shall on the first of each month ascertain and determine the amount necessary for the succeeding month to meet the interest and sinking fund charges on all outstanding bonds, loans or other indebtedness that may exist, due to the construction of the water works and commonly known as ‘Water Works Bonds or Obligations’; and, also the expenses necessary for conducting, managing and operating the water works, including the amount necessary for the repairs, enlargement or extension of the water works system, including the reservoirs, and shall certify said amount to the City Auditor and the City Treasurer.
“All moneys in excess of that required for the hereinbefore mentioned purpose shall be deemed a surplus, and shall be used for general municipal purposes, to-wit: fixed charges and current expenses of the municipality.
*149 “The Director of Publio Service shall, not later than the fifth day of each month, draw a voucher for said surplus to the City Treasurer, who shall place the same to the credit of the General Fund of the City of Cincinnati.
“The City Auditor and the City Treasurer are hereby authorized and directed to use and apply said surplus toward the payment of Fixed Charges and Current Expenses as set forth in the semiannual appropriation ordinance of the City of Cincinnati.”
It is contended that both sections of the ordinance are illegal for three principal reasons:
1. That the ordinance is in contravention of Section 3959, General Code.
2. That the same is in contravention of Section 3799, General Code.
3. That the same is in contravention of the special legislative act of April 24, 1896, found in 92 Ohio Laws, 606 et seq., entitled: “An act to provide for water works purposes in cities of the first grade of the first class” and of another act of the same date found in 92 Ohio Laws, 605, entitled: “An act to prescribe the purposes for which water rents may be assessed and collected in cities of the first grade of the first class.”
Consideration will be given to each of the three foregoing propositions.
First, is the ordinance illegal because it contravenes the provisions of Section 3959, General Code?
It should be stated at this point that the superior court based its judgment upon the affirmative of this proposition and gave no consideration to either of the other propositions. Section 3959, General Code, reads as follows:
*150 “After paying the expenses of conducting and managing the water works, any surplus therefrom may be applied to the repairs, enlargement or extension of the works or of the reservoirs, the payment of the interest of any loan made for the construction or for the creation of a sinking fund for the liquidation of the debt. The amount authorized to be levied and assessed for water works purposes shall be applied by the council to the creation of the sinking fund for the payment of the indebtedness incurred for the construction and extension of water works and for no other purpose whatever. ’ ’
Section 3959, General Code, above quoted, has nothing to do with the rates and charges for water, neither does it reflect upon the question whether or not a profit may properly be made, nor does it control the municipal authorities in any way in the conduct or operation of their waterworks. It will be seen of course that the first half of the section relates to what application may be made of the rents and revenues derived from the sale of water, and that the second half relates to what shall be done with the proceeds of the levy of any taxes upon the real and personal property of the city in the event any levy shall be made for waterworks purposes. It is true that in one sentence the word “may” is employed, and in the other sentence the word “shall.” From this fact it is sought to be shown that the first part is permissive and the second part mandatory, and it is claimed from this fact that the surplus revenues derived from water rents are not necessarily confined to the purposes stated in the statute. This construction would confer upon the authorities the right to add to the *151 language of the first sentence any other provisions which the authorities of the city might from time to time find it to their advantage to add. It will be seen that the entire first sentence is not permissive in form. The water rents must necessarily be first applied to the payment of the expenses of conducting and managing the waterworks, and it is only the surplus which is authorized to be applied to repairs, enlargements, extensions, and interest and principal of debt arising out of construction. If it shall be insisted that the word “may” leaves a residue of authority, and reposes some discretion in the authorities having control of the fund, and if it be admitted that such construction is a proper one, it may still be answered that such authorities have the discretion either of applying the surplus in the manner therein stated or carrying it as a surplus, thereby permitting a reduction of the rates and charges in future years. That is to say, they “may” either do nothing whatever with the surplus, which would automatically and necessarily operate to bring about a reduction of rates and charges, or maintain the rate and apply the surplus thus produced to extensions, new construction, or interest and principal of debts.
It is urged on the one hand that the statute does not expressly forbid the use of the surplus for general municipal purposes and that in the absence of such prohibition the power must be held to exist. It is urged on the other hand that the city has only such power over rates and charges as the legislature has expressly conferred, and that the construction of the act must be the same as if the word “only” was inserted therein. The latter rule of *152 construction must- be adopted, otherwise the- entire sentence is- rendered meaningless. Unless the section holds the city strictly to the purposes therein named, and if the city authorities may add any other uses and purposes in expending the surplus, the question must arise whether any limitations are legally imposed upon the city in the employment of such surplus. Such a construction must necessarily lead to absurd results. Municipalities get their authority for levying taxes and raising revenues from the legislature, and the legislature must be held to have the power to place proper limitations thereon. It being provided that the surplus may be used for extensions, and for interest and loans for waterworks construction, it will be presumed that the legislative intent has thereby been exhausted and that it was not intended that the city should have any power over the surplus beyond the terms of the power expressly granted. For the purpose of determining the legislative intent the maxim expressio unius est exclusio alterius has direct application. That maxim has peculiar application to any statute which in terms limits a thing to be done in a particular form, and in such case it necessarily implies that the thing shall not be done otherwise. That maxim finds its chief use as an aid in ascertaining the whole scope of a law. The foregoing construction of Section 3959 makes that section applicable to the present controversy, and, if the section is constitutional, is sufficient to fully dispose of this branch of the inquiry. Let us therefore inquire as to its constitutionality.
It is contended by counsel for the city that by reason of the home-rule provisions of the state con *153 stitution, as found in Article XVIII of the amendments of 1912, Section 3959 is either not constitutional or by reason of those provisions and the schedule that portion of the section relating to disposition of surplus has been repealed. It is important at this point to inquire into the nature of rates and charges which are in excess of an amount sufficient to pay the cost of the operation of the waterworks and to make provision for repairs, renewals, extensions, new construction, and interest and principal of debt arising out of construction. While it is universally conceded that rates and charges not in excess of the amount necessary to meet such purposes are not classed as taxes, it does not follow that such excessive amount would not be classed as taxes. While it is quite well settled that charges for service and conveniences rendered and furnished by a municipality to its inhabitants are not taxes, yet where the charge is in excess of the entire cost of the service and convenience, the reason for the rule no longer prevails. A water rate exacted for actual consumption is merely the price of the commodity, and when in an amount which fairly compensates the cost can have no proper relation to those revenues which are expended for the equal benefit of the public at large, and it should not be placed in the same classification with burdens and charges imposed by the legislative power upon persons or property for the purpose of raising money for general governmental purposes. Taxation refers to those general burdens imposed for the purpose of supporting the government, and more especially the method of providing the revenues which are expended for the equal benefit of *154 all the people. It is apparent that any effort on the part of any municipality to deliberately impose rates and charges for a water supply, not for the purpose of covering the cost of furnishing and supplying the water, but for the purpose of making up a deficiency in the general expenses of the municipality, and which cannot be met within the limits of taxation otherwise provided, is to that extent an effort to levy taxes, and, to the same extent, an effort to evade the statutory and constitutional limitations upon that subject. It requires no argument to show that the taxing power is a legislative power. Lima v. McBride, 34 Ohio St., 338, 350, and Board of Education v. McLandsborough, 36 Ohio St., 227.
If the ordinance under consideration in this case amounts to an effort to levy taxes for general municipal purposes, and if the taxing power is legislative in its nature, then the legislature has the power to place such restrictions thereon as have in fact been provided in Section 3959, General Code. While the power of taxation is expressly committed to the general assembly, the power is not specially and specifically conferred by the Ohio Constitution, but it is contained in the general legislative grant conferred by Section 1, Article II. The special provisions in .the constitution relating to the subject of taxation, found in Article XII and in Section 13, Article XVIII, are not delegations of authority upon the subject of taxation, but rather limitations upon the power otherwise generally conferred by Section 1, Article II. In the instant case the petition presents not a question as to whether it is lawful to impose a tax upon the consumption of water, but whether the legislature has in fact placed a lim *155 itation upon the power of assessing rates and charges. By virtue of the provisions of Section 10, Article XII of the Ohio Constitution, laws may he passed providing for excise taxes, and unless the legislature sees fit to place some limitation upon rates and charges for water, it would seem very clear that rates and charges might legally be made beyond the cost of furnishing the water. It seems very clear on the other hand that by virtue of the provisions of Article XII, and Section 13 of Article XVIII, the legislature has power to place limitations thereon; and the provisions of Section 3959 are in the nature of such limitation.
Again returning to Sections 4, 5 and 6, Article XVIII of the Constitution, to inquire what effect those sections have, as limiting the power of the legislature over the matter of rates and charges, it will be observed that by those sections municipalities have been invested independently of legislative provision, with power to acquire, construct, own, lease and operate public utilities, and it must be admitted therefore that the legislature may not pass any law to interfere with or burden municipalities in their attempt to do any of the things which they are thus empowered to do. It is not intended by the judgment of the court in this case to attempt to alter, or amend, or detract from either the letter or the spirit of the home-rule provisions which the people have written into their constitution, but it is equally important that the provisions thus written into the constitution shall not be extended beyond the language and spirit of those provisions. It is not intended by anything herein stated to overrule the principles declared in the case of Village of *156 Euclid v. Camp Wise Assn., 102 Ohio St., 207, but we think that case may be easily disposed of as an authority with the simple statement that placing limitations upon the rates and charges to be made for the product and service of a public utility, and making such limitations apply to all cities alike, is not imposing burdens upon certain municipalities which do not apply to others. If it had been, intended by the people that municipalities should have full control over the matter of rates and charges, and if it had been believed by the people at the time the home-rule provisions were framed and adopted that control over rates and charges was necessary to the complete acquisition, construction, owning, leasing and operating of a public utility, it would have been a very simple matter to have added such provisions. May it not be assumed that having failed to do so, the people foresaw the very thing which has actually happened? It is not difficult to see at this time that to give municipalities full control over rates and charges for a public utility municipally owned would cause all limitations upon taxation to become entirely meaningless and futile. Referring to Section 3, Article XVIII, and still desiring not to run counter to any of the provisions of Article XVIII, it must be conceded that the authority granted to municipalities to exercise powers of local self-government does not operate to take away from the legislature the power to place limitations upon taxation. We are the more strongly of this opinion because in the same article, in Section 13 thereof, the people have specifically, reiterated some of the provisions which were already generally stated in Article XII. May it not he as *157 sumed that this was for the purpose of special emphasis and in order that there might he no mistake as to the power of the legislature over the matter of taxation by municipalities notwithstanding the liberal concessions made to municipalities in the other sections of Article XVIII?
It has been repeatedly held by this court that those sections of Article XVIII of the Ohio Constitution relating to municipal ownership and operation of utilities confer plenary powers, but in none of those cases has it been decided that municipally owned utilities are entirely free from all regulations which may be provided by general laws.
2. Is the Cincinnati ordinance in contravention of Section 3799, General Code?
That section makes provision for transfer of funds of municipalities, and the portion of same which applies to this transaction is as follows:
“But there shall be no such transfer except among funds raised by taxation upon all the real and personal property in the corporation, nor until the object of the fund from which the transfer is to be effected has been accomplished or abandoned. ’ ’
The language of that section seems entirely clear, and fits the controversy perfectly, unless the section is either inoperative or unconstitutional as being contrary to the home-rule provisions already discussed. The observations hereinbefore made relative to the effect of the home-rule provisions upon Section 3959 have equal force and application to the provisions of Section 3799, and for the same reasons as hereinbefore stated it must be held that Section 3799 is operative, constitutional and ap *158 plicable to this controversy. It requires no argument to show that the revenues which might be raised by an increase of water rates would not create a fund “raised by taxation upon all the real and personal property in the corporation. ” It is equally certain that the “object of the fund from which the transfer is to be effected” has not been accomplished while there are approximately eleven millions of dollars of bonds still outstanding.
3. What is the effect of the special act of April 24, 1896, by virtue of whose provisions the Cincinnati waterworks were constructed?
It should be stated that that act has been adjudged by this court, in Alter v. City of Cincinnati, 56 Ohio St., 47, to be constitutional in all of its provisions, except Section 8 thereof, which section has no relation to this controversy, and it must be assumed that the persons and firms who have bought and still own the outstanding Cincinnati waterworks bonds purchased the same upon the faith of this special act, and that the act, especially Section 10 thereof, became a part of the contract between the city and the bondholders.
The act will be found in 92 Ohio Laws, 606, et seq. By the provisions of Section 10 of that act, found on page 611, all outstanding bonds are a lien upon the waterworks in favor of the bondholders and upon all property then owned and thereafter acquired for public purposes and are also a lien “upon the net income of the waterworks.” It is true that the bondholders are not making any complaint of this ordinance, neither have they been made parties to this proceeding; nor have they waived their lien upon such net income. The surplus income re *159 ferred to in the ordinance must necessarily mean exactly the same thing as “the net income of the waterworks” referred to in Section 12 of the waterworks act, because there is no net income until expenses of operation, interest upon bonds, and sinking fund provisions have been fully met.
While the foregoing act seems clear enough to effectively require the entire proceeds of water rates and charges in the city of Cincinnati to be expended solely for waterworks purposes, it will be found that the general assembly, on the same day, to-wit, April 24, 1896, passed another special act applying to the city of Cincinnati, which also very specifically granted to the board having charge of the waterworks of said city the power to assess and collect water rents for the purpose of paying expenses of conducting and managing the waterworks and all betterments, enlargements and improvements of the works, and for the payment of the interest and principal of any loans,, and for the creation of a sinking fund for the liquidation of any debt created for waterworks purposes.
It is not necessary to discuss these propositions at greater length, because Cincinnati is a charter city and it is pointed out that the charter contains the following provisions:
“All legislative power of the City shall be vested in Council, subject to the general and all local or special laws enacted by the General Assembly of the State of Ohio, now in force,, relating to the organization and government of cities and their officers, and defining and limiting their powers and duties in so far as they apply to the City of Cincinnati, which-laws are hereby adopted and continued *160 in force as the charter of our city, except as herein amended or supplemented.”
We have reached the conclusion that this section of the Cincinnati charter must have been intended as a reaffirmation of all special laws theretofore passed by the general assembly relating to the city of Cincinnati, including the special waterworks act. The ordinance under consideration is not an amendment of the charter, but is merely an ordinance enacted by the city council. We have therefore concluded that for all of the foregoing three reasons the judgment of the lower courts should be affirmed.

Judgment affirmed.

Wanamaker, Robinson and Matthias, JJ., concur.
Hough, J., concurs in propositions 1 and 2 of the syllabus and in the judgment.